IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2021 Term

_____

No. 19-0428
_____

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

JEFFREY ALAN SNYDER
Defendant Below, Petitioner

FILED
**April 8, 2021**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

_____

Appeal from the Circuit Court of Roane County
The Honorable Anita Ashley
Criminal Action No. 18-F-61

REVERSED AND REMANDED

_____

Submitted: February 9, 2021
Filed: April 8, 2021

Clinton W. Smith, Esq.
Law Office of Clinton W. Smith
Charleston, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Benjamin J. Yancey, III, Esq.
Assistant Attorney General
Jessica A. Lee, Esq.
Charleston, West Virginia
Counsel for Respondent

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE ARMSTEAD concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1. "When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error." Syllabus Point 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

2. "In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. Similarly, an appellate court reviews *de novo* whether a search warrant was too broad. Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made." Syllabus Point 2, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

3. The authority granted to law enforcement officers serving domestic violence emergency protective orders to accept the surrender of firearms under a civil

i

proceeding, West Virginia Code § 48-27-403 (2006), is not equivalent to search-and-seize authority under search warrants in criminal matters. So, an officer's use of a domestic violence emergency protective order as a de facto search warrant infringes on Fourth Amendment protections unless some other exception to the warrant requirement applies to validate the search.

4.    "'The general rule is that the voluntary consent of a person who owns or controls premises to a search of such premises is sufficient to authorize such search without a search warrant, and that a search of such premises, without a warrant, when consented to, does not violate the constitutional prohibition against unreasonable searches and seizures.' Syllabus Point 8, *State v. Plantz,* 155 W.Va. 24, 180 S.E.2d 614 (1971), *overruled in part on other grounds by State ex rel. White v. Mohn,* 168 W.Va. 211, 283 S.E.2d 914 (1981)." Syllabus Point 22, *State v. Ladd*, 210 W. Va. 413, 557 S.E.2d 820 (2001).

5.    "Consent to search may be implied by the circumstances surrounding the search, by the person's prior actions or agreements, or by the person's failure to object to the search. Thus, a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" Syllabus Point 1, *State v. Flippo*, 212 W. Va. 560, 575 S.E.2d 170 (2002).

6.	"'Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment and Article III, Section 6 of the West Virginia Constitution—subject only to a few specifically established and well-delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative.' Syllabus Point 1, *State v. Moore*, 165 W. Va. 837, 272 S.E.2d 804 (1980), *overruled in part on other grounds by State v. Julius*, 185 W. Va. 422, 408 S.E.2d 1 (1991)." Syllabus Point 20, *State v. Ladd*, 210 W. Va. 413, 557 S.E.2d 820 (2001).

7.	"Property observed during an illegal or improper search cannot be subsequently seized pursuant to a lawful search warrant which was based solely upon observations made during the illegal search." Syllabus Point 2, *State v. Stone*, 165 W. Va. 266, 268 S.E.2d 50, (1980) *overruled in part on other grounds by State v. Julius*, 185 W. Va. 422, 408 S.E.2d 1 (1991).

iii

WALKER, Justice:

Jeffrey Alan Snyder appeals an order denying his motion to suppress evidence that he contends was the fruit of an illegal entry and search of his home. Law enforcement officers went to Mr. Snyder's home to serve a domestic violence emergency protective order (EPO). While the EPO prohibited Mr. Snyder from possessing firearms and provided for the surrender of firearms to the officer serving it, the officers interpreted the EPO as a search warrant permitting them to enter and search Mr. Snyder's home for weapons. When the officers entered the home, they smelled marijuana and did a protective sweep of the premises, which included a pat down of Mr. Snyder and those in his home. The pat down and protective sweep yielded methamphetamine and a home growth marijuana operation, and that evidence prompted law enforcement officers to then seek an actual search warrant for Mr. Snyder's home.

We conclude that an EPO is not a de facto search warrant: the statute authorizing EPOs and procedures for issuance of an EPO do not meet the probable cause standards necessary to issue a search warrant compliant with the Fourth Amendment of the United State Constitution and Article III, Section 6 of the West Virginia Constitution. Here, the State relied exclusively on the EPO to justify its entry into Mr. Snyder's home below. So, we conclude that no exception to the warrant requirement applies under these facts to otherwise validate the entry and search of Mr. Snyder's home. Because the circuit court erred in denying Mr. Snyder's motion to suppress this evidence, we reverse

1

the circuit court's April 3, 2019 conviction and sentencing order and remand the case for further proceedings.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On March 27, 2018, Mr. Snyder's ex-wife filed an ex parte petition in the Magistrate Court of Kanawha County for an EPO against him.  The magistrate court issued the EPO the same day.[1]  The EPO form has boxes where the court may indicate whether there are firearms involved or firearms present on the property, but neither were marked.  As to firearms, the form EPO orders that "Respondent shall surrender any and all firearms and ammunition possessed or owned by the Respondent to the law enforcement officer serving this Order."[2]  It further puts the Respondent on notice that possession of firearms, whether properly licensed or not, while a protective order is in effect may result in criminal liability.[3]

Because Mr. Snyder was living in Amma, West Virginia, the EPO was transferred from Kanawha County to Roane County, for service by the Roane County

---

[1] After issuing the EPO, the magistrate court transferred the petition to family court for hearing on April 2, 2018.  Mr. Snyder's ex-wife failed to appear for the hearing, so the family court denied the domestic violence protective order and terminated the EPO.

[2] Correlative with that directive is the authorization for the law enforcement officer serving the EPO to *receive* the firearms and ammunition.

[3] *See* W. Va. Code § 48-27-502 (2006).  In 2018, shortly after Mr. Snyder's arrest, this code provision was amended stylistically.

Sheriff's Department. Sheriff L. Todd Cole alleges he spoke with Mr. Snyder's ex-wife who informed him that Mr. Snyder had several guns in the residence and that she believed him to be using methamphetamine. Sheriff Cole and three other officers went to serve the EPO at Mr. Snyder's residence on March 28, 2018. Sheriff Cole alleges that he knocked on the door of Mr. Snyder's home and Mr. Snyder opened the door, at which point Sheriff Cole informed Mr. Snyder that an order of protection had been issued against him. Sheriff Cole states that it was raining, which is one of the reasons he stepped inside the residence. While Sheriff Cole alleges he asked to come in before stepping inside, he does not allege that Mr. Snyder told him he could come inside or otherwise answered or gestured for him to do so.

Sheriff Cole stepped into the residence, claiming that the EPO ordered him to seize all firearms while serving the order. Sheriff Cole later testified that he intended to enter the residence, with or without Mr. Snyder's consent, and to search all places where a two-to-three-inch gun could be found pursuant to the EPO. After entering, he smelled marijuana and saw another individual in the home. That prompted Sheriff Cole and the other officers to pat down both Mr. Snyder and the other individual for officer safety, and a small baggie of white powder consistent with methamphetamine was found in Mr. Snyder's pocket. Upon learning that there was another person upstairs in the home, Sheriff Cole and the other officers performed a protective sweep, and while doing so observed marijuana plants and other items in the home consistent with an indoor marijuana growth operation.

3

Mr. Snyder was arrested and transported to the Sheriff's Department. While other officers secured the home, Sheriff Cole filed a complaint and affidavit for a search warrant for Mr. Snyder's residence. The search warrant was issued and officers found more items consistent with a growth operation, THC extraction, and distribution practices in the residence. Mr. Snyder was later indicted for one count of manufacturing a controlled substance (marijuana), and one count of possession with intent to deliver a controlled substance (marijuana).

Mr. Snyder filed a motion to suppress all evidence derived from the search of his home, arguing the entry and search violated his Fourth Amendment rights. The circuit court disagreed, and denied the motion to suppress, finding that the "[EPO] further required the Roane County Sheriff to seize any firearms at the time of the service of the [EPO][,]" and that "law enforcement was legally in the home of the Defendant when a strong odor of marijuana was observed and a bucket of green marijuana was observed in plain view during a protective sweep of the home."

After the court's ruling, Mr. Snyder agreed to plead guilty to manufacturing a controlled substance (marijuana), while preserving his right to appeal the circuit court's order denying the motion to suppress evidence from the search.[4]

---

[4] *See* W. Va. R. Crim. P. 11(a)(2). *See also State v. Legg*, 207 W. Va. 686, 690, 536 S.E.2d 110, 114 (2000) (discussing conditional plea agreements in context of illegal

## II. STANDARD OF REVIEW

This Court undertakes a multi-faceted standard of appellate review of a motion to suppress: "we take the facts in the light most favorable to the State, review the circuit court's factual findings for clear error, and conduct a de novo review of the determination of whether the search or seizure violated the Fourth Amendment."[5] That standard is derived from syllabus points 1 and 2 of *State v. Lacy*:

> When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.[6]

> In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. Similarly, an appellate court reviews *de novo* whether a search warrant was too broad. Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made.[7]

---

search and seizure allegations). The circuit court suspended the imposition of a prison sentence in favor of five years of probation.

[5] *State v. Deem*, 243 W. Va. 671 , 849 S.E.2d 918, 923 (2020).

[6] Syl. Pt. 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

[7] *Id.* at syl. pt 2.

Applying that standard, we turn to our analysis as to whether the search conducted at Mr. Snyder's home runs afoul of the Fourth Amendment's proscription against unreasonable search and seizure.

## III.   ANALYSIS

The Fourth Amendment to the United States Constitution,[8] and the correlative provision of the West Virginia State Constitution, Article III, Section 6,[9] protects people against certain kinds of governmental intrusion.[10]  The United States Supreme Court has held that the physical entry of the home by law enforcement is the " 'chief evil against which the wording of the Fourth Amendment is directed.'"[11]  And this Court has adhered to the view that the warrant procedure minimizes that sort of danger.

---

[8] U.S. Const. amend. 4 ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

[9] W. Va. Const. art. III, § 6 ("The rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, shall not be violated. No warrant shall issue except upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, or the person or thing to be seized.").

[10] *Katz v. United States*, 389 U.S. 347, 350-51 (1967).  It has been said that "(t)he most basic function of any government is to provide for the security of the individual and of his property." *Miranda v. Arizona*, 384 U.S. 436, 539 (1966) (White, J., dissenting).

[11] *Payton v. New York*, 445 U.S. 573, 585-86 (1980) (citing *United States v. United States District Court*, 407 U.S. 297, 313 (1972)).

We have explained that "the touchstone of the Fourth Amendment's promise is 'reasonableness,' which generally, though not always, translates into a warrant requirement."[12] Those circumstances falling into that "not always" category – exceptions to the warrant requirement – are "few[,] specifically established[,] and well-delineated."[13] In applying those exceptions to the circumstances in which officers conducted a search outside of the judicial process, we have discussed that "the exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative."[14]

This recitation of Fourth Amendment protections and case law related to the search warrant requirement and exceptions thereto is oft-repeated, and its application formulaic despite its complexity. The first inquiry is whether there was a warrant. And, if not, is there some exception to the warrant requirement to justify the search? But, this fact pattern departs from that conventional analysis in that the Roane County Sheriff's Department was acting under color of court order – technically *inside* judicial process – but that order was not a search warrant.

---

[12] *Lacy*, 196 W. Va. at 112, 468 S.E.2d at 727 (citing *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646 (1995)).

[13] Syl. Pt. 20, in part, *State v. Ladd*, 210 W. Va. 413, 557 S.E.2d 820 (2001) (quoting Syl. Pt. 1, *State v. Moore*, 165 W. Va. 837, 272 S.E.2d 804 (1980), *overruled on other grounds by State v. Julius*, 185 W. Va. 422, 408 S.E.2d 1 (1991)).

[14] *Id.*

7

At the suppression hearing, Sheriff Cole stated unequivocally that he believed the EPO required him to enter Mr. Snyder's home and to search it for all spaces where a two-to-three-inch gun could be found, and to seize those firearms. Essentially, the State argued below, and the circuit court agreed, that the EPO was tantamount to a general search warrant. We do not read the statute authorizing the issuance of an EPO so broadly, nor do we find that issuance of a de facto search warrant under the procedures employed in obtaining an EPO is constitutionally tenable.

West Virginia Code § 48-27-403 (2006), delineating the procedures for EPOs, states at subsection (a) that

> [u]pon the filing of a verified petition under this article, the magistrate court may enter an emergency protective order as it may deem necessary to protect the petitioner or minor children from domestic violence and, upon good cause shown, may do so ex parte without the necessity of bond being given by the petitioner.

And, the statute continues, "[i]f the magistrate court determines to enter an emergency protective order, the order shall prohibit the respondent from possessing firearms."[15]

This statutory framework for EPOs is insufficient to justify a valid search and seizure under the guise of a search warrant. The most obvious problem is the stark and crucial difference between a statutory requirement that the order prohibit possession of firearms and a statutory *authorization* to order a *search and seizure* of firearms. That

---

[15] W. Va. Code § 48-27-403(a).

8

is not to suggest that the magistrate court issued an infirm order; the EPO issued here tracked the appropriate statutory language. It ordered Mr. Snyder to *surrender* his firearms and ammunition to law enforcement and informed him of the ramifications for continued possession of firearms, but nowhere did it authorize law enforcement to *seize* them, nor did it authorize a search of his home, person, outbuildings, car, or other area where he might keep a firearm, despite Sheriff Cole's belief to the contrary.[16]

Notwithstanding the statutory deficiencies of equating an EPO with a search warrant, we emphasize the distinctions that arise between the two from a procedural safeguards perspective. The process of obtaining an EPO is a civil proceeding, not a criminal one. With that distinction comes the loss of procedural safeguards both implicitly and explicitly required of criminal proceedings, a different standard of proof, and the potential for abuse of the EPO process.

In obtaining a search warrant under Rule 41 of the West Virginia Rules of Criminal Procedure,

> [a] warrant shall issue only on an affidavit or affidavits sworn to before the magistrate or a judge of the circuit court and establishing the grounds for issuing the warrant. If the magistrate or circuit judge is satisfied that grounds for the application exist, or that there is probable cause to believe that they exist, that magistrate or circuit judge shall issue a warrant identifying the property or person to be seized and

---

[16] There is no claim that Mr. Snyder was asked to surrender his firearms and refused.

naming or describing the person or place to be searched. The finding of probable cause may be based upon hearsay evidence in whole or in part. Before ruling on a request for a warrant the magistrate or circuit judge may require the affiant to appear personally and may examine under oath the affiant and any witnesses the affiant may produce, provided that such proceeding shall be taken down by a court reporter or recording equipment and made part of the affidavit.[17]

And importantly, a court is authorized to issue a search warrant only "*upon the request of a law enforcement officer or an attorney for the state*,"[18] and that application must be accompanied by affidavit sworn to or affirmed before the judge or magistrate that sets forth the facts establishing the grounds for issuing the warrant.[19]

The procedure for obtaining an EPO is markedly different than the one required for law enforcement officers to obtain a search warrant in a criminal matter. An EPO may issue upon the filing of a petition by *any* person seeking relief for themselves, on behalf of a minor or incapacitated individual, or who reported or was a witness to domestic violence and who now feels threatened because of it.[20] Only the verified petition of the applicant is required, and the petition need only contain "a short and plain

---

[17] W. Va. R. Crim P. 41(c).

[18] W. Va. R. Crim. P. 41(a) (emphasis added).

[19] W. Va. Code § 62-1A-3; W. Va. R. Crim. P. 41(c).

[20] W. Va. Code § 48-27-305 (2001). *See also* W. Va. Code § 48-27-304(b) (2001) ("No person shall be refused the right to file a petition under the provisions of this article.").

statement of the facts."[21]  The potential for abuse if any person may file for an EPO and, if granted, subject the respondent to an intrusive search cannot be understated.

That concern weighs heavy when we consider that under the civil framework of an EPO, no probable cause standard is applied.  An EPO may issue if the magistrate deems it necessary to protect the petitioner or minor children, and may do so ex parte without the necessity of bond upon a showing of good cause.[22]  And, if we interpret EPOs as imputing authority to search anywhere a two-to-three-inch gun may be found, we would circumvent the particularity required of search warrants, in which the person or property to be searched must be specified.[23]  An EPO, under the argument advanced by the state, would authorize an open-ended search of a respondent's person, home, car, effects, workspace, or any other plausible place a respondent might actually or constructively possess a firearm.

---

[21] W. Va. Code § 48-27-403(a); W. Va. R. Prac. and Proc. For Domestic Violence 8(b).

[22] *Id.*  Clear and convincing evidence of immediate and present danger is sufficient to constitute "good cause" under this code provision.

[23] *See* syl. pt. 3, *Lacy*, 196 W. Va. 104, 468 S.E.2d 719 ("A search warrant must particularly describe the place to be searched and the things or persons to be seized. In determining whether a specific warrant meets the particularity requirement, a circuit court must inquire whether an executing officer reading the description in the warrant would reasonably know what items are to be seized. In circumstances where detailed particularity is impossible, generic language is permissible if it particularizes the types of items to be seized. When a warrant is the authority for the search, the executing officer must act within the confines of the warrant.").

11

Search warrant procedures and safeguards are fundamental to constitutional protections against unreasonable search and seizure, and the statutory and procedural framework of EPOs is not equipped to provide those same procedural safeguards so as to comport with the Fourth Amendment or Article III, Section 6 of the West Virginia Constitution. For these reasons, we hold that the authority granted to law enforcement officers in serving domestic violence emergency protective orders to accept the surrender of firearms under a civil proceeding, West Virginia Code § 48-27-403 (2006), is not equivalent to search-and-seize authority under search warrants in criminal matters. So, an officer's use of an EPO as a de facto search warrant infringes on Fourth Amendment protections unless some other exception to the warrant requirement applies to validate the search.

Having answered the first question as to whether the EPO gave Sheriff Cole the authority to conduct the search in the negative, we return to our formulaic analysis and ask, was there some exception to the warrant requirement that could justify the search of Mr. Snyder's person and home?

Breaking down the search, we have two separate issues: the entry itself and the subsequent search of the home during the protective sweep, during which the marijuana growth operation was observed. It is undisputed that Sheriff Cole did not smell marijuana – prompting the search of Mr. Snyder's person – until after he stepped into the home. It is also undisputed that until Sheriff Cole stepped into the home, there

was no cause for a protective sweep.  So, the initial inquiry is whether an exception to the warrant required applies to constitutionally validate Sheriff Cole's entry into Mr. Snyder's home in the first place.

For the reasons discussed above, the entry into Mr. Snyder's home was presumptively unreasonable as Sheriff Cole was armed with an EPO to be *served* not a warrant entitling the Roane County Sheriff's Department to search and seize firearms:

> "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment and Article III, Section 6 of the West Virginia Constitution—subject only to a few specifically established and well-delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative." Syllabus Point 1, *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980), *overruled in part on other grounds by State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991).[24]

And, given that the search at issue was of Mr. Snyder's home, we observe that "the need for a heightened standard of suspicion is at its zenith"[25] because "activities which take place within the sanctity of the home merit the most exacting Fourth Amendment protection."[26]  We have discussed that

---

[24] Syl. Pt. 20, *State v. Ladd*, 210 W. Va. 413, 557 S.E.2d (2001).  *See also Lacy*, 196 W. Va. at 111, 468 S.E.2d at 726 ("'It is a 'basic principle of Fourth Amendment Law' that searches and seizures inside a home without a warrant are presumptively unreasonable.'") (*quoting Payton v. New York*, 445 U.S. 573, 586, (1980)).

[25] *Lacy*, 196 W. Va. at 111, 468 S.E.2d at 726.

[26] *Id.* at 113, 468 S.E.2d at 728.

[e]xamples of recognized exceptions to the general warrant requirement include certain brief investigatory stops, searches incident to a valid arrest, seizures of items in plain view, searches and seizures justified by exigent circumstances, consensual searches, and searches in which the special needs of law enforcement make the probable cause and warrant requirements impracticable.[27]

But, the heightened standard of suspicion is unnecessary here since the State did not argue below that any exception to the warrant requirement applied. Indeed, Sheriff Cole testified not once, but twice at the suppression hearing that prior to entering the home, he did not have a search warrant, did not have an arrest warrant, was not in pursuit, that there was no emergency existing that would have required him to go into the house, and that he had no probable cause to believe a crime had been committed.

Rather than seeking exemption from the warrant requirement, the State relied exclusively on the authority of the EPO to justify the entry.[28] Sheriff Cole testified, "[t]he order that we had from Kanawha County was for the purpose of not only of serving, but we had – we were ordered to collect any firearms that were at the home." And later in the hearing, Sheriff Cole testified that it was his intention, before even getting out of the car, to enter the home and search it for firearms. In denying the motion

---

[27] *Ullom v. Millers*, 227 W. Va. 1, 9, 705 S.E.2d 111, 119 (2010) (citing *Warrantless Searches and Seizures,* 37 Geo.L.J. Ann.Rev.Crim.Proc. 39, 40 (2008)).

[28] As noted above, the protective sweep of the home was premised on smelling marijuana and the presence of other individuals in the home. At this point in the analysis, we concern ourselves only with the justifications for entering the home.

14

to suppress based on its determination that the EPO legally authorized law enforcement to be in Mr. Snyder's home, the circuit court explained:

> Based upon the evidence presented, the Court FINDS Sheriff L. Todd Cole and other members of law enforcement in Roane County went to the home of the Defendant on March 28, 2018 for the purpose of serving a Domestic Violence Protective Order issued in Kanawha County, West Virginia. The Court FINDS said Order further required the Roane County Sheriff to seize any firearms at the time of the service of the Order. The Court FINDS law enforcement was legally in the home of the Defendant when a strong odor of marijuana was observed and a bucket of green marijuana was observed in plain view during a protective sweep of the home.

There is no evidence in the record or in the language of the order that suggests the circuit court based its conclusion that law enforcement was legally in the home on anything but the authority of the EPO; no exception to the warrant requirement was proffered or otherwise even presented at the suppression hearing.

Nevertheless, on appeal to this Court, the State filed a summary response asserting an alternative argument that an exception to the warrant requirement – implied consent – operated to validate Sheriff Cole's entry in addition to its contention that the EPO justified entry to the home. Later, at oral argument, the State abandoned its argument that the EPO justified the entry and relied on implied consent.

As to consent, generally, we have held:

> "The general rule is that the voluntary consent of a person who owns or controls premises to a search of such premises is sufficient to authorize such search without a

15

search warrant, and that a search of such premises, without a warrant, when consented to, does not violate the constitutional prohibition against unreasonable searches and seizures." Syllabus Point 8, *State v. Plantz,* 155 W.Va. 24, 180 S.E.2d 614 (1971), *overruled in part on other grounds by State ex rel. White v. Mohn,* 168 W.Va. 211, 283 S.E.2d 914 (1981).[29]

Or, consent may be implied by a defendant's conduct: "[c]onsent to search may be implied by the circumstances surrounding the search, by the person's prior actions or agreements, or by the person's failure to object to the search. Thus, a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'"[30]

The State's implied consent argument is this: "although it is not evident from his testimony during the suppression hearing, Sheriff Cole, prior to stepping into Petitioner's house, *asked if he could come into his house*."[31] That argument is derived from Sheriff Cole's statement in filling out the criminal complaint against Mr. Snyder, in which he stated, "[t]his officer asked to step inside of the residence as the order stated that this officer had to seize all firearms at the time of service of the order." According to the State, Sheriff Cole having asked to enter the home and subsequently entering it gives rise to a finding that he had implied consent to do so. And more than that, the State asks

---

[29] Syl. Pt. 22, *Ladd*, 210 W. Va. 413, 557 S.E.2d 820.

[30] Syl. Pt. 1, *State v. Flippo*, 212 W. Va. 560, 575 S.E.2d 170 (2002).

[31] Emphasis in original.

16

us to find that assumption, on its own, suffices for an exception to the warrant requirement.

While we view factual findings with deference to the circuit court, and construe facts in the light most favorable to the State as the prevailing party below,[32] the circuit court was not presented with this argument, and thus made no findings to that effect. The criminal complaint -- specifically Sheriff Cole's statement in the criminal complaint that he asked to come in to Mr. Snyder's house -- was available to the State at the time of the suppression hearing, and yet it did not make any argument for consent below, nor did Sheriff Cole testify at the time of the suppression hearing that he asked to come in.

Regardless, the evidence of implied consent is entirely limited to Sheriff Cole's statement that he asked to come in. There is no evidence that Mr. Snyder responded to the question at all, or any evidence that Mr. Snyder constructively responded to the question by gesturing or otherwise inviting Sheriff Cole to come inside. Instead, we are presented with suppositions and inferences at odds with Sheriff Cole's unadulterated belief that he could enter Mr. Snyder's home with or without his consent because the EPO gave him that authority:

> Q. At that point, it was your intention to go into the house
> and search it for weapons, firearms; correct?

---

[32] *See* syl. pt. 1, *Lacy*, 196 W. Va. 104, 468 S.E.2d 419.

A.  Per the order, yes, sir.

. . .

Q.  Before you came into the house, did you tell Mr. Snyder you were coming into the house to search it for guns?

A.  I told him that we had a protective order, and that I had an order to take any guns that were in the home.

Q.  Did you tell him you were coming in to get them?

A. Oh, I'm sure we did.  It was raining, too, and that was one of the reasons we stepped in from outside to the inside.

Q.  At no point did Mr. Snyder have the opportunity to tell you no, you were not coming in?

A.  I don't know that he has the right to tell me no with an order from a judge.

Q.  And if he had, you would have ignored it and went in anyway?

A.  We would have followed the order, yes, sir.


At no point in the suppression hearing did Sheriff Cole state that he asked Mr. Snyder to come inside his home.  At no point in the suppression hearing did the State or Sheriff Cole even suggest that Mr. Snyder impliedly or overtly consented to entry into his home.  The State suggested at oral argument that Mr. Snyder could have physically prevented Sheriff Cole from entering his home if he wished to convey his lack of consent.  Given Sheriff Cole's testimony that he had the authority to enter Mr. Snyder's home and would have ignored Mr. Snyder and gone in anyway had Mr. Snyder outright refused him entry, we find that argument unpersuasive.

18

The State relied on the EPO to its own detriment when it neglected to present any other justification for the intrusion into Mr. Snyder's home. In doing so, the State seemingly forgot that the burden of overcoming the presumption of illegality rests on it, not the defendant.[33] While the State would have us affirm on an implied consent theory or remand for further development of the implied consent question, it has presented near-negligible evidence to support either conclusion. We are disinclined to give the State a second bite at the apple to develop a theory available to it all along.

Because we conclude that Sheriff Cole had no authority to enter Mr. Snyder's home, it follows that the evidence collected once inside is inadmissible as a fruit of the illegal intrusion.[34] A classic fruit of the poisonous tree scenario: if Sheriff Cole had not entered the home unlawfully, he would not have smelled marijuana, would not have patted down Mr. Snyder, would not have heard or observed others in the home so as to justify the protective sweep, and the home growth operation would not have been in plain view. And, that evidence could not serve as the basis for the search warrant obtained after the fact, as we have held that "[p]roperty observed during an illegal or improper search cannot be subsequently seized pursuant to a lawful search warrant which

---

[33] *See Lacy*, 196 W. Va. at 111, 468 S.E.2d at 726 ("When the State seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception.").

[34] *State v. Stone*, 165 W. Va. 266, 268 S.E.2d 50, (1980) *overruled in part on other grounds by State v. Julius*, 185 W. Va. 422, 408 S.E.2d 1 (1991).

was based solely upon observations made during the illegal search."[35] A later finding of criminality does not a constitutionally-valid intrusion make. So, we need not examine whether the protective sweep was appropriate under the circumstances that unfolded afterward.

## IV.   CONCLUSION

For the reasons set forth above, we find error in the circuit court's order denying Petitioner's motion to suppress, and reverse the April 3, 2019 conviction and sentencing order of the Circuit Court of Roane County and remand the case for further proceedings.

Reversed and remanded.

---

[35] *Id.* at syl. pt. 2. We further note that there is no independent source to serve as the basis for the after-acquired search warrant, nor is there any other apparent exception to the exclusionary rule.